## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

HOLLIS HARRELL,

        *Plaintiff*,

   v.

PNC FINANCIAL SERVICES GROUP,
INC.,

        *Defendant*.

No. 18-cv-2472 (DLF)

## MEMORANDUM OPINION

Hollis Harrell brings this employment discrimination action against his former employer, PNC Financial Services Group, Inc (PNC).  *See* Am. Compl. ¶¶ 1, 10, Dkt. 27.  He alleges that the defendant terminated his employment based on his age, in violation of the Age Discrimination in Employment Act of 1967 (ADEA), 29 U.S.C. §§ 621 *et seq.*  Am. Compl. ¶ 1.  Before the Court is the defendant's Motion for Summary Judgment, Dkt. 46.  For the reasons that follow, the Court will grant the motion.

## I.  BACKGROUND

### A.  Factual Background

At the outset, the Court notes that the plaintiff has repeatedly failed to comply with Local Civil Rule 7(h).  This rule provides, in relevant part, that "[a]n opposition to . . . a [summary judgment] motion shall be accompanied by a separate concise statement of genuine issues setting forth all material facts as to which it is contended there exists a genuine issue necessary to be litigated, which shall include references to the parts of the record relied on to support the statement."  The plaintiff has committed two errors.  First, he has purported to dispute facts

introduced by the defendant without any citation to the record.  *See, e.g.*, Harrell's Statement of Material Facts in Dispute ¶¶ 25, 26, 43, 52, 119, Dkt. 50-1.  When a nonmovant so errs, "the district court is under no obligation to sift through the record and should instead deem as admitted the moving party's facts that are uncontroverted by the nonmoving party's Rule 7(h) statement."  *Dage v. Johnson*, 537 F. Supp. 2d 43, 52 (D.D.C. 2008) (cleaned up); *see also Oviedo v. Wash. Metro. Area Transit Auth.*, 948 F.3d 386, 396–98 (D.C. Cir. 2020) (affirming grant of summary judgment against a pro se plaintiff who failed to dispute the defendant's statement of facts); *Jackson v. Finnegan, Henderson, Farabow, Garrett & Dunner*, 101 F.3d 145, 154 (D.C. Cir. 1996) (holding that district court may deem facts that do not comply with Rule 56(e) or the local rule as admitted because "the district court is under no obligation to sift through the record . . . in order to evaluate the merits of that party's case").  This is because "judges 'are not like pigs, hunting for truffles buried in briefs' or the record." *Potter v. District of Columbia*, 558 F.3d 542, 553 (D.C. Cir. 2009) (Williams, J., concurring) (quoting *United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991)).  The Court shares the defendant's frustration, *see* Def.'s Reply at 3–4, Dkt. 53, with the plaintiff's attempt to confound the defendant (and the Court) with multiple variations of facts, as reflected in Pl.'s Statement of Material Facts in Dispute, Dkt. 50-1, Pl.'s Statement of Undisputed Facts, Dkt. 50-1, and the Pl.'s Opp'n at 4–16, Dkt. 50.  The Court will not consider asserted facts that do not comply with Local Rule 7(h).

Second, the plaintiff has repeatedly purported to dispute a fact by providing either legal commentary, which does not belong in a Rule 7(h) statement, or facts that are not responsive to the defendant's statement.  *See, e.g.*, Pl.'s Statement of Material Facts in Dispute ¶¶ 24, 30–32, 34, 38–39, 53.  In opposing a movant's statement of facts, the nonmovant must "specifically

controvert" the facts introduced by the defendant.  *Tarpley v. Greene*, 684 F.2d 1, 7 (D.C. Cir. 1982).  Providing legal commentary and related, but non-responsive, facts does not meet that requirement.  Accordingly, when a nonmovant provides only those materials, there is no "genuine dispute" regarding the relevant fact, Fed. R. Civ. P. 56(a), and the Court may treat the fact as admitted, *see, e.g.*, *Burke v. Gould*, 286 F.3d 513, 517–18 (D.C. Cir. 2002); *SEC v. Banner Fund Int'l*, 211 F.3d 602, 616 (D.C. Cir. 2000); *Jackson*, 101 F.3d at 154.  Given the plaintiff's repeated failure to comply with the local rules, the Court will do so here.

   *1.*  *Harrell and PNC: an introduction*[1]

  Harrell began working for PNC as a Merchant Services account executive in the greater Washington area in June 2005.  Def.'s Statement of Facts ¶ 1.  At the time of his hire, he was almost forty-three years old.  *Id.* ¶ 2.  He was fifty-four years old when he was terminated.  *Id.*

  The Merchants Services division of PNC works with businesses to provide "various non-cash payment processing methods, such as equipment to accept and process credit and debit card payments."  *Id.* ¶ 3.  Account executives in this division are responsible for "develop[ing] relationships with the bankers who worked at [PNC's] branches . . . and look[ing] for referrals and prospects to bring in merchant business."  *Id.* ¶ 5.

---

[1] The Court cites to the Defendant's Statement of Undisputed Facts, Dkt. 47, if a fact is undisputed.  If the plaintiff specifically disputes a fact with record evidence, the Court will indicate as such.  Furthermore, the Court cites directly to the deposition transcripts when relevant.  All of the cited pages of the O'Kelly deposition can be found in Dkt. 50-4.  All of the cited pages of the Harrell deposition can be found at Dkt. 50-3.  All of the cited pages of the Chopra deposition can be found at Dkt. 50-7.  The cited pages of the Moses deposition can be found in three places:  Pages 1–4, 13–56, 73–88, 105–108, 113–24, 153–56, 161–216, 229–40, 249–84, 289–328, 333–40 can be found at Dkt. 46-3; pages 21–24, 37–48, 61–72, 89–112,173–84, 333–36 can be found at Dkt. 50-5; and pages 1–4, 65–76, 85–100, 133–36, 141–44, 173–80, 185–88, 193–200, 217–20, 245–56, 293–305 can be found at Dkt. 55-1.  The cited pages of the Gross deposition can be found in two places: Pages 13–16, 65–76, 105–08, 117–24 can be found at Dkt. 50-10; and pages 1–4, 69–72, 97–100 can be found at Dkt. 55-5.

All account executives "were responsible for meeting various monthly and annual sales goals and quotas," which "were consistently applied to all" account executives. *Id.* ¶ 12. These metrics were not set by Harrell's direct supervisors but rather came from higher up. *Id.* PNC considered a few different metrics in assessing performance: Units, Total Revenue, Discount Interchange Actor Assessment (DIA), and Self-Originated Deals (SOD). *Id.* ¶ 14. Units were "the number of new merchant business relationships acquired by an" account executive, and they "were the primary metric driver for overall performance" because "they were the most controllable by the [account executive] and demonstrative of an [account executive]'s efforts. *Id.* ¶¶ 14–15. Total Revenue "measure[d] total revenue generated from equipment sales, fees, processing volumes, etc." *Id.* ¶ 14. DIA "measure[d] both new and existing account profitability." *Id.* SODs "are new merchant deals generated by an [account executive] using their own efforts as opposed to partner referrals." *Id.* PNC considered all categories to be "very important" such that an account executive "had to deliver on all of them." *Id.* ¶ 16. Non-numerical considerations in PNC's "comprehensive, holistic view of performance" were "having strong partnerships and partner feedback, lacking any escalated issues and complaints from partners, and having a consistent routine and sales processes within their assigned region." *Id.* ¶ 17.

PNC set goals for each of these metrics based on the account executives' tenure of service through designation of account executives as A, B, and C "reps," with higher expectations the longer an account was with the company. *Id.* ¶ 18. During his time at PNC, Harrell's designation varied, *id.* ¶ 18, but he was always aware of his "monthly and annual sales goals and quotas" from "the beginning of the year in his Compensation Plan" and throughout the year in "emails and communications from his managers further reiterating his monthly and

annual sales goals and quotas," *id.* ¶ 19.  Harrell "received mid-year and annual performance evaluations from all of his managers throughout his employment with PNC." *Id.* ¶ 20.  From April 2012 to May 2015, Harrell reported to Market Manager Keith O'Kelly, age forty-three, who in turn reported to Territory Sales Manager Linda Hunley, age fifty-one. *Id.* ¶ 21.

PNC has a system of progressive corrective action for employees "who engage in misconduct or deficient performance" that "includ[es], but [is] not limited to, the issuance of verbal warnings, written warnings, probation, and termination." *Id.* ¶ 8.  In its written Corrective Action Policy, PNC says it "does not give [an employee] the right, contractual or otherwise, to any particular level of corrective action or corrective action process prior to termination of employment." *Id.*  An employee on probation "can be terminated at any point within the 90-day probationary period." *Id.* ¶ 9.  Managers can "issue verbal and written warnings" on their own but must call into the Employee Relations Information Center (ERIC) for a consultation with an ER Specialist for "[h]igher level corrective action such as probation or termination." *Id.* ¶ 11.  "ER Specialists have discretion to escalate a situation beyond what the manager is recommending, and can object to a proposed termination decision." *Id.*

## 2.  *Harrell's performance under O'Kelly*

In 2012, Harrell "was assigned to branches in the Northern Virginia and the Western Beltway regions." *Id.* ¶ 22.  That year, three managers in that area complained to O'Kelly about Harrell. *Id.* ¶ 23.  Two "expressed to O'Kelly that they should potentially consider terminating" Harrell, and one complained about Harrell's "work ethic and performance" and indicated he "no longer wanted to work with" Harrell, and one expressed similar concerns over Harrell's work ethic. *Id.*  O'Kelly substantiated these complaints about his work ethic "and observed that [he] did not spend enough time in the branches with the branch managers and the business bankers."

*Id.* ¶ 24.  On May 12, 2012, O'Kelly issued a verbal corrective action to Harrell for "fail[ing] to meet his monthly Unit goal of 14, and because his 12-month rolling percentage to goal was 64% and not 100% or higher."  *Id.* ¶ 25.  This corrective action required Harrell to "send out daily detailed emails to his team about the state of merchant services; spend at least four out of five days per week in the branches conducting business prospecting; and attend meetings."  *Id.*  The document informed warned Harrell that he "must show an immediate and sustained performance in hitting his" goal or he would be subject to "further corrective action, up to and including termination of employment."  *Id.*

On June 5, 2012, O'Kelly issued a written warning to Harrell "for again failing to meet his Unit production goal" as an A rep because the previous month he "had achieved 10 Units, which was only 71% of his goal."  *Id.* ¶ 26.  The written warning document again reminded him that "immediate and sustained performance in hitting" his quotas was necessary.  *Id.*  In his 2012 performance review, Harrell received the second lowest rating.  *Id.* ¶ 28.  "His year-to-date Units were at 55% to plan, and his Total Revenue was at 59% of plan."  *Id.*

"In June 2013, O'Kelly moved [Harrell] to the Metro Northeast region."  *Id.* ¶ 29. Harrell had this large region with more branches all to himself instead of having to share Western Beltway with Pat Fiorina.  *Id.*  For his mid-year review, Harrell again received the second-lowest rating, and his evaluation noted that his "Unit production was only 68% to plan." *Id.* ¶ 30.  In his 2013 annual review, his rating remained the same, his "Unit production was at 64% and Revenue was at 67%" of his target, and O'Kelly observed that there needed to be "some significant improvement" in SODs.  *Id.* ¶ 31.

O'Kelly moved Harrell again in January 2014, this time to DC East.  *Id.* ¶ 32.  He made this move because the account executive who was then assigned to the region had "personality

conflicts" with people there. *Id.*[2] This region "was one of the more prominent regions . . . and had a reputation for its high revenue generation, and was one of the top producing, top performing merchant account unit regions." *Id.* ¶ 33. O'Kelly issued a verbal warning to Harrell on June 23, 2014. *Id.* ¶ 34. Then, on August 1, 2014, O'Kelly issued Harrell a written warning "for his continued deficient performance." *Id.* The document explained that Harrell "[wa]s not meeting the minimum standards in the areas of unit production 59% to plan, DIA production 45% to plan and Total Revenue production 78% to plan." *Id.*[3] During Harrell's 2014 mid-year evaluation, O'Kelly informed Harrell that his "Unit production and DIA were significantly below expectations" and that Harrell "was responsible for owning the Merchant Services outcome." *Id.* ¶ 35. Harrell again received the second lowest rating on his 2014 annual performance evaluation. *Id.* ¶ 36. His "Unit production was at 58%; DIA was at 46%; and Total Revenue was at 57%." *Id.* Despite a requirement of three SODs per month, Harrell had booked only three SODs for the whole year. *Id.* ¶ 37.[4] O'Kelly commented that Harrell's "performance

---

[2] Harrell disputes this was the reason for the move and claims it was because O'Kelly thought "he had done a solid job in Metro Northeast and O'Kelly expected that success to continue." Pl.'s Statement of Material Facts in Dispute ¶ 32. The cited deposition testimony does not support that proposition. O'Kelly did testify that he thought Harrell would hit his goals in DC East "because he had done a solid job in Metro Northeast," O'Kelly Dep. at 133:13–19, but O'Kelly says nothing at this point about the reason for the move. Accordingly, the Court treats this fact as undisputed.

[3] Harrell disputes "the extent that this corrective action purports to represent the totality of Harrell's performance." Pl.'s Statement of Material Facts in Dispute ¶ 34. But his citation to the record does not refute the factual contents of the performance evaluation. The fact that O'Kelly testified that Harrell "got off to a very good start in terms of connecting with" managers, O'Kelly Dep. at 75:6–18, says nothing about whether Harrell met his performance goals. Accordingly, the Court treats this fact as undisputed.

[4] Harrell disputed that he had only three SODs to O'Kelly at the time, "stating that plenty of joint calls should have counted as SODs." Pl.'s Statement of Material Facts in Dispute ¶ 37. But he does not dispute that PNC had attributed only three SODs to him. *See* Harrell Dep. at 327:3–

in 2014 was very disappointing and unacceptable." *Id.* ¶ 36.  O'Kelly further stated that Harrell

"ha[d] struggled to gain the initial engagement of his partners and the alignment of leadership

and is often viewed as another regional employee instead of the leader of the merchant

outcome." *Id.* ¶ 38.  In total, Harrell was in DC East for one year, and "O'Kelly was

disappointed that [Harrell] was not able to meet even the minimum expectations for hitting his

quotas and goals in DC East." *Id.* ¶ 39.

In January 2015, O'Kelly and his supervisor created a new account executive position to

be focused exclusively on healthcare.  *Id.* ¶ 41.  O'Kelly selected Harrell for the role "because he

was very experienced and professional." *Id.* ¶ 42.  Although the lead healthcare banker, Robert

Lowry, expressed concerns about Harrell's selection, he eventually agreed to Harrell's

assignment.  *Id.* ¶ 43.  Lowry's concerns were similar to complaints O'Kelly received from other

managers about Harrell's "lack of urgency and overall engagement." *Id.* ¶ 44.  Despite these

concerns, O'Kelly thought Harrell could manage the new assignment, and Harrell accepted the

position.  *Id.* ¶¶ 45–46.  In this new role, Harrell's performance quotas were reduced to that of a

C rep.  *Id.* ¶ 48.  Although Harrell had not met his Unit goals once since O'Kelly started

managing him and had "not consistently exceed[ed] the revenue goal," *id.* ¶ 49, O'Kelly

nonetheless thought Harrell "would at least be able to meet, and certainly exceed his revenue

goal based on C level production" because of the larger size of healthcare deals, *id.* ¶ 50.

Under O'Kelly's supervision, Harrell did not always take responsibility and "deflected

and blamed others for his failure to meet his goals." *Id.* ¶ 51.[5]  O'Kelly received complaints

---

328:4.  Accordingly, the Court treats that fact as undisputed.  Additionally, his opinion on what
ought to count as a SOD is not a fact.

[5] Harrell disputes PNC's statement, responding that "O'Kelly claim[ed] Harrell did take
responsibility for the most part."  Pl.'s Statement of Material Facts in Dispute ¶ 51.  The totality

about Harrell's "lack of partnership engagement and lack of branch activity," and some bankers

avoided working with him.  *Id.* ¶ 52.  He noted that Harrell had trouble "prospecting or

developing referrals from his partners" and "was looking for referrals to be given to him versus

cultivating relationships and helping his partners identify referrals."  *Id.* ¶ 53.  O'Kelly also

received complaints that Harrell did not attend all business prospecting appointments he was

expected to, such that "the majority of partners were frustrated in" his selectivity "of who he

would go out and visit with."  *Id.* ¶ 54.  These complaints came up in all the regions in which

Harrell worked under O'Kelly.  *Id.* ¶ 55.

While Harrell worked under O'Kelly, O'Kelly made a few comments to Harrell.  During

a corrective action meeting with Harrell, O'Kelly said that PNC wanted "fresh new blood."  *Id.*

¶ 119 (quoting Harrell Dep. at 219:12–13).  Another time, O'Kelly made fun of Harrell for still

having a flip phone, which Harrell admitted was a joke.  *Id.*

### 3.    *Harrell's performance under Moses*

In May 2015, O'Kelly moved to a different role, and PNC chose Blossom Moses to

replace him as Merchant Services Market Manager and Harrell's supervisor.  *Id.* ¶ 58.  Moses,

thirty-seven years old at the time of Harrell's termination, reported to Territory Sales Manager

Ray Gross, fifty-one years old at the time of Harrell's termination.  *Id.* ¶ 59.  Moses observed

that Harrell was completing deals with only one or two out of the six or seven healthcare

bankers.  *Id.* ¶ 62.[6]  Moses learned that those healthcare bankers did not want to work with

---

of the cited O'Kelly deposition does not refute the narrower fact that O'Kelly believed that
Harrell *sometimes* did not take responsibility for his performance, but it is disputed whether he
*never* took responsibility.

[6] Harrell claims that this is disputed.  Pl.'s Statement of Material Facts in Dispute ¶ 62.  His
citation to the Mohit Chopra deposition does not refute PNC's fact.  Chopra was a Business
Banking Sales Manager when Moses supervised Harrell.  *See* Chopra Dep. at 11:15–12:13.  The

Harrell and reached out to other account executives because "they were dissatisfied with how [Harrell] handled their leads, their customers, and because of his lack of follow-up and lack of urgency." *Id.* ¶ 63.  After discovering that Harrell "had broken partnerships with almost all of the healthcare bankers," she "worked with [him] to . . . repair [those] relationships." *Id.* ¶ 64.  To support Harrell, Moses told the other account executives that they had to pass all calls from healthcare bankers on to Harrell and that she would transfer the credit for any healthcare deal to Harrell, which she did for a deal by Jessica Jay Burgess. *Id.* ¶ 65.  Nonetheless, Moses continued to receive complaints from healthcare bankers between June and September 2015. *Id.* ¶ 66.

In October 2015, Moses assigned Harrell eight to ten branches in DC West. *Id.* ¶ 67.  The parties dispute the motivation for this reassignment. *Compare id.* (claiming the purpose was to give Harrell extra referral partners) *with* Pl.'s Statement of Material Facts in Dispute ¶ 67 (claiming the purpose was because Jessica Jay Burgess wanted out of a region she thought was difficult).  They also dispute how good of a region DC West was. *Compare* Def.'s Statement of Undisputed Facts ¶ 68 (Moses describing it as a "high-performing and high-opportunity region") *with* Pl.'s Statement of Material Facts in Dispute ¶ 68 (Harrell describing it as "probably the worst region in the . . . greater Washington area").[7]  Although Moses initially received positive

---

healthcare bankers did not report to Chopra, so the fact that he did not receive information about the healthcare bankers' issues with Harrell and whether they would work with him does not contradict Moses' testimony. *See id.* at 32:11–19, 35:17–36:7.  Chopra's deposition is the only basis plaintiff provides to object to this fact.  Accordingly, the Court treats this fact as undisputed.

[7] Harrell further claims that Moses "took [him] out of the health care bankers" when assigning him the DC West branches, *see* Pl.'s Statement of Material Facts in Dispute ¶ 68 (quoting Harrell Dep. at 140:9), but this is contradicted by (1) Harrell's admission that the DC West assignment was in addition to his healthcare assignment, *see id.* ¶ 67, (2) Moses's testimony that he was assigned to the healthcare bankers until he was fired, *see* Def.'s Resp. to Pl.'s Asserted Disputed Facts ¶ 68, Dkt. 55 (citing Moses Dep. at 297:6–7), and (3) the fact that Moses continued to

feedback about Harrell from managers in D.C. West, *see* Pl.'s Statement of Material Facts in Dispute ¶ 69 (citing Moses Dep. at 46:20–47:17); Def.'s Resp. to Pl.'s Asserted Disputed Facts ¶ 69 (conceding this), Moses eventually received negative feedback from DC West bankers and managers similar to that she received from the healthcare bankers—that Harrell "lacked responsiveness, had no sense of urgency, lacked follow-up," and was not "interested in going to meet the client" "if it was a small business," *see* Def.'s Statement of Undisputed Facts ¶ 69. Moses and Chopra shared this feedback with Harrell, who "bec[a]me defensive, disagree[d] with the feedback, deflect[ed], blame[d] others, and ma[d]e excuses." *Id.* ¶ 70; *see also id.* ¶ 71 (elaborating on Chopra's discussions with Harrell).

In his 2015 annual performance review, Harrell received the second lowest rating. *Id.* ¶ 73. Despite having the lowest quotas (as a C rep), Harrell's annual Units production was 45% of his target and his revenue production 79% of his target. *Id.* ¶ 75.

In 2016, Moses also discovered Harrell was categorizing healthcare banker deals as SODs every month, which was incorrect, and despite notifying him, he continued to do so. *Id.* ¶ 72; Moses Dep. at 306:2–308:14. She held all of her account executives "accountable across the board for hitting their goals" and looked at all categories—Units, Revenue, DIA, and SODs—in assessing them. *Id.* ¶¶ 80–81. In February 2016, she spoke with Harrell about missing his Unit and Clover goals. *Id.* ¶ 82. Around the same time, healthcare bankers continued to make complaints about Harrell's performance, and one of the top healthcare bankers, Travis Dickens, refused to work with Harrell despite Moses's entreaties. *Id.* ¶¶ 83–84. Moses consistently received feedback from the healthcare bankers that Harrell "was slow in his

---

receive complaints about Harrell from healthcare bankers, *see id.* (citing Moses Dep. at 293:1–297:7). Accordingly, the Court does not credit Harrell as raising a genuine dispute as to this fact.

responsiveness, lacked follow-up, and showed no sense of urgency." *Id.* ¶ 85.  Mangers and

other bankers also expressed similar concerns to Moses and her supervisor, Gross.  *Id.* ¶¶ 85–

86;[8] *see also id.* ¶ 87 (discussing complaints about Harrell raised to Moses by a leading DC West

business banker, Gupta); *id.* ¶ 88 (discussing negative feedback from Ed Puzio in March 2016).[9]

By the end of March, Harrell had booked only three deals for the month, "which was very

low," and Moses reached out to him to help determine where adjustment was needed.  *Id.* ¶ 89.

Moses issued a written warning to Harrell on April 1 because his first quarter performance was

"below minimum standards"—he had only 12 Units out of a goal of 30, 8 Clovers out of a goal

of 12, and 38% TAS equipment penetration out of a goal of 50%.  *Id.* ¶ 90.  As a part of his

corrective action, Harrell was required to "have a daily call [with] his Business Banking Sales

Manager . . . ; visit all 8 of his branches consistently, every two weeks; and meet his SOD goal at

100% or above each month."  *Id.*  To help him reach his quotas, Moses also required Harrell to

connect with all eight branches once per week, connect with the region's business bankers daily,

---

[8] Although Harrell claims that this is disputed, *see* Pl.'s Statement of Material Facts in Dispute ¶ 86, he fails to raise a genuine dispute of material fact.  First, his statement "[s]ee above," which could refer to any material in the prior twenty-nine pages of his Statement, is an inadequate response.  Second, the cited testimony from Gross discusses performance in DC West, *see* Pl.'s Statement of Material Facts in Dispute ¶ 86, and is not responsive to PNC's facts about negative feedback from managers and other bankers.  Finally, when Gross asked Moses "to investigate and gain a better understanding of 'what was going on,'" *id.* (quoting Gross Dep. at 71:1), this specifically referred to Harrell, not DC West in general, as the plaintiff's statement suggests.  Accordingly, the Court treats this fact as undisputed.

[9] Harrell claims that this is disputed.  Pl.'s Statement of Material Facts in Dispute ¶ 88.  However, the fact that there were also emails from late March in which Harrell showed a sense of urgency does not dispute the fact that Moses received negative feedback about Harrell earlier that month.  Accordingly, the Court treats as disputed Harrell's sense of urgency throughout the entire month, *compare id.* (documenting some positive emails about Harrell between Moses, Puzio, and others), *with* Def.'s Resp. to Pl.'s Asserted Disputed Facts ¶ 88 (explaining that the urgency came only late in the month), but treats as undisputed the fact that Moses did receive negative feedback in March about Harrell's urgency and follow-up, *see* Def.'s Statement of Undisputed Facts ¶ 88.

make at least ten outbound calls per day to certain branch leads, conduct at least two SOD appointments per week, and check in with Moses daily. *Id.* ¶ 93. The corrective action warned Harrell that failure to meet the goals would "result in further disciplinary action up to probation/termination," and Harrell understood this. *Id.* ¶ 91.

Even after receiving the corrective action in April, Harrell did not follow the process set out by Moses or arrange any SOD appointments. *Id.* ¶ 94. During this time, Moses would attend some of Harrell's calls and "directly observed [his] lack of sense of urgency and follow up." *Id.* ¶ 95. She had a follow-up conversation with him on May 3 to remind him to take the steps outlined in the corrective action. *Id.* ¶ 96. Throughout the first half of 2016, Moses saw "the same consistent nonperformance." *Id.* ¶ 97 (quoting Moses Dep. at 237:15). Moses continued to receive complaints about Harrell even after issuing him the written warning. *Id.* ¶ 98. As a result, Moses began discussions with Gross and PNC's employee resource center to place Harrell on probation. *Id.* ¶ 99. In this process, she noted that Harrell had continued not meeting his quotas and was not consistently following the corrective action plan. *Id.* ¶ 100. Harrell was placed on probation on June 3, 2016. Def.'s Mot. for Summ. J. Ex. 31, Dkt. 46-31. The probation document contained the same requirements Moses articulated to Harrell in April, including that he meet his quotas of 10 Units, 3 Clovers, and 3 SODs. Def.'s Statement of Undisputed Facts ¶ 101. The document warned Harrell that failure to meet these goals could lead to termination. *Id.* ¶ 102.

Over the next month, Moses did not see Harrell improve in the manner outlined in his probation document. *Id.* ¶ 104. Harrell failed to deliver "on every single metric or action point listed in his Corrective Action." *Id.* ¶ 105; *see also id.* ¶ 106 (explaining he was behind on his Unit and Revenue goals). Moses noticed that Harrell "would become defensive, make excuses,

and blame" others for not meeting his goals and not closing deals. *Id.* ¶ 107.  She also observed

that he did not make changes in his process in response to failing to meet his quotas. *Id.* ¶ 108.

Moses continued to receive complaints from healthcare bankers and from employees in DC West

about Harrell. *Id.* ¶ 109.

In July 2016, Gross and Blossom contacted employee resources specialist Sharnel

Jackson, and they unanimously decided to terminate Harrell based on his continued failure to

meet his goals. *Id.* ¶ 110. On July 21, Moses met with Harrell and explained that PNC was

terminating him for failing to make progress on meeting his goals, failing to take the corrective

actions required, and continuing to generate complaints from other employees. *Id.* ¶¶ 111–12.

Later that year, Moses hired Gary Chenault, age forty-five, to replace Harrell. *Id.* ¶ 116.  In

2018, O'Kelly recruited Harrell to hold a similar position to the one he had at PNC at the

company for which O'Kelly then worked, and Harrell accepted the job. *Id.* ¶ 120.

### 4.    *Other employees*

While Harrell worked for PNC, he claims that other employees who looked older

departed in "odd" or "unexplained" circumstances. *Id.* ¶ 121.  Such departures that he found

suspicious included his first supervisor, a branch manager, a healthcare banker, a business

banker, and an administrator. *Id.* ¶ 122.  Harrell admits that "he ha[d] no direct personal

knowledge of the reason for" their departures and "no knowledge of their respective performance

histor[ies]." *Id.* ¶ 123.

There were account executives both older and younger than Harrell working the greater

Washington market. *See id.* ¶ 124 (chart of twelve account executives by age and performance).

The oldest, Pat Fiorina, aged sixty-five, "was consistently a top performer and almost every year

she won the Market All Star award." *Id.* ¶ 125.  Out of those twelve account executives, four of

whom were older than Harrell, none of them were terminated for performance issues. *Id.* ¶ 126. Several voluntarily departed, a few left because their positions were eliminated, and three over the age of forty remain employed by PNC. *Id.* Five of the twelve—some older and some younger than Harrell—received corrective actions from Moses in 2015 or 2016. *Id.* ¶ 127. For example, Castaneda, aged fifty-two, received a written warning and was eventually placed on probation. *Id.* ¶¶ 124, 128. However, unlike Harrell, Castaneda's performance improved, Moses did not receive customer or partner complaints about him like she did for Harrell, and Castaneda eventually became a top three performer. *Id.* Because of this improved performance, he completed his probation period without termination. *Id.* ¶ 129. Although Harrell "believes Castaneda was subjected to heightened scrutiny by Moses" and "was very upset about receiving corrective action," Harrell had no knowledge of Castaneda's performance history. *Id.* ¶ 132.[10]

Harrell also identified Harold Hambel, aged sixty-one, as an employee he believed was subject to discrimination. *See id.* ¶ 130. Harrell admitted, however, that "this was based on the speculation he overheard . . . that Hambel was not performing well." *Id.* He also admitted that "he never saw Hambel's disciplinary history or performance evaluations" and that O'Kelly had given Hambel performance warnings. *Id.* Harrell believed that Damienne Aissi also "was subjected to heightened scrutiny by Moses" but admitted that Aissi never indicated that it was because of her age. *Id.* ¶ 131. Writ large, Harrell admitted that he had not seen the disciplinary actions or histories for any other PNC employee and that he did not know whether they had improved their performance in response. *Id.* ¶ 136.

---

[10] Harrell claims that this is disputed. Pl.'s Statement of Material Facts in Dispute ¶ 132. However, whether people thought Castaneda or others were treated unfairly, *see id.*, is not responsive to PNC's facts about Harrell's subjective beliefs, Castaneda's performance and discipline, and whether Harrell had any concrete knowledge about them. Accordingly, the Court treats this fact as undisputed.

### B.    Procedural History

On February 27, 2017, Harrell filed a charge with the Equal Employment Opportunity Commission (EEOC).  Am. Compl. ¶ 6.  Around July 26, 2018, the EEOC issued his Right-to-Sue Notice, *id.* ¶ 7, and on October 26, 2018, Harrell filed the original complaint in this suit against PNC.  *See* Compl., Dkt. 1.  After the defendant filed a Partial Motion to Dismiss, Dkt. 16, the plaintiff moved to amend the complaint, Dkt. 26, which the Court granted, Minute Order of December 17, 2019.  Per the amended complaint, Harrell alleges a single count of age discrimination in violation of the ADEA.  Am. Compl. ¶¶ 39–46.  PNC's motion for summary judgment is now ripe for review.

## II.    LEGAL STANDARD

Under Rule 56, summary judgment is appropriate if the moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 247–48 (1986).  A "material" fact is one that could affect the outcome of the lawsuit.  *See Liberty Lobby*, 477 U.S. at 248; *Holcomb v. Powell*, 433 F.3d 889, 895 (D.C. Cir. 2006).  A dispute is "genuine" if a reasonable jury could determine that the evidence warrants a verdict for the nonmoving party.  *See Liberty Lobby*, 477 U.S. at 248; *Holcomb*, 433 F.3d at 895.  In reviewing the record, the court "must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence."  *Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 150 (2000).

A party "opposing summary judgment" must "substantiate [its allegations] with evidence" that "a reasonable jury could credit in support of each essential element of [its] claims."  *Grimes v. District of Columbia*, 794 F.3d 83, 94 (D.C. Cir. 2015).  The moving party is

entitled to summary judgment if the opposing party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

## III.   ANALYSIS

The ADEA provides that "[i]t shall be unlawful for an employer . . . to discharge any individual . . . because of such individual's age." 29 U.S.C. § 623(a). "To succeed on an ADEA claim, the plaintiff 'must prove, by a preponderance of the evidence, that age was the "but-for" cause of the challenged adverse employment action.'" *Bilal-Edwards v. United Planning Org.*, 15 F. Supp. 3d 1, 11 (D.D.C. 2013) (quoting *Gross v. FBL Fin. Servs.*, 557 U.S. 167, 180 (2009)). When a plaintiff relies on circumstantial, rather than direct, evidence to establish discrimination, the familiar burden-shifting framework from Title VII set out in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), applies. *See Hall v. Giant Food, Inc.*, 175 F.3d 1074, 1077 (D.C. Cir. 1999) (applying *McDonnell Douglas* to ADEA claims). In a termination case, the plaintiff must first establish a prima facie case of discrimination by showing that (1) "he belongs in the statutorily protected age group;" (2) "he was qualified for the position;" (3) "he was terminated;" and (4) "he was disadvantaged in favor of a younger person." *Id.* (citing *Paquin v. Fed. Nat'l Mortg. Ass'n*, 119 F.3d 23, 26 (D.C. Cir. 1997)). The burden then "shifts to the employer to articulate legitimate, non-discriminatory reasons for the challenged employment decision." *Id.* (quoting *Aka v. Wash. Hosp. Ctr.*, 156 F.3d 1284, 1288 (D.C. Cir. 1998) (en banc)). At that point, the plaintiff, "as part of his ultimate burden of persuasion, must come forward with evidence that would allow a jury to credit his evidence of age discrimination and discredit the employer's seemingly nondiscriminatory motivation." *Steele v. Mattis*, 899 F.3d 943, 948 (D.C. Cir. 2018). He may satisfy that obligation "either indirectly by showing the

employer's reason is pretextual or directly by showing that it was more likely than not that the employer was motivated by discrimination." *Id.* (internal quotation marks omitted).

The D.C. Circuit has stressed that courts should tread carefully when evaluating employers' personnel decisions.  Courts "may not second-guess an employer's personnel decision absent demonstrably discriminatory motive." *Fischbach v. D.C. Dep't of Corr.*, 86 F.3d 1180, 1183 (D.C. Cir. 1996) (alteration and internal quotation marks omitted).  A court's role is not to evaluate the "correctness or desirability" of the non-discriminatory reasons, but to decide "whether the employer honestly believes in the reasons it offers." *Id.* (internal quotation marks omitted).  "At all times, however, the plaintiff 'retains the burden of persuasion' to prove, by a preponderance of the evidence, that 'age was the "but-for" cause of the challenged employer decision.'" *Glenn v. Bair*, 643 F. Supp. 2d 23, 29 (D.D.C. 2009) (quoting *Gross,* 557 U.S. at 177 (2009)).

Here, the parties do not contest that the plaintiff has made out a prima facie case of age discrimination.  *See* Def. PNC's Mem. of P. & A. in Supp. of Mot. for Summ. J. at 1–2, Dkt. 48; Pl. Hollis Harrell's Mem. in Opp'n to PNC's Mot. for Summ. J. at 1, Dkt. 50.  PNC has offered poor performance as the "legitimate, non-discriminatory reason[] for the challenged employment decision," *Hall*, 175 F.3d at 1077.  *See* Def.'s Mem. at 1–2.  As explained below, PNC has met "its burden of producing a nondiscriminatory reason for [its] action." *Threadgill v. Spellings*, 377 F. Supp. 2d 158, 162 (D.D.C. 2005).  Harrell also has failed to present "evidence that would allow a jury to credit his evidence of age discrimination and discredit . . . [PNC's] seemingly nondiscriminatory motivation." *Steele*, 899 F.3d at 948.

## A.    Legitimacy of Proffered Explanation

The defendant has proffered that Harrell was fired because of poor performance under two different supervisors.  *See* Def.'s Mem. at 4–5.  While he worked for O'Kelly, he never hit his Unit goal "head on or above."  Def.'s Statement of Undisputed Facts ¶ 49.  O'Kelly also received complaints from area managers about Harrell's work ethic, which he substantiated.  *Id.* ¶¶ 23–24.  Even after O'Kelly put him on corrective action in 2012, Harrell continued to not meet his goals.  *Id.*  ¶¶ 25–27.  This problem persisted into 2013 and 2014.  *Id.* ¶¶ 29–31, 33–39.  In 2015, O'Kelly moved Harrell into a new role and reduced his performance quotas.  *Id.* ¶¶ 41–50.  Nonetheless, Harrell continued to struggle, and O'Kelly continued to receive complaints about Harrell's lack of engagement and failure to attend all business appointments.  *Id.* ¶¶ 51–55

A similar pattern continued after Moses became Harrell's supervisor in 2015.  She received predominantly negative feedback about Harrell's lack of "responsiveness, . . . sense of urgency," and "follow-up."  *Id.* ¶ 69.  He did not always take responsibility and sometimes "blame[d] others."  *Id.* ¶ 70.  Harrell's supervisors issued verbal and written performance warnings in 2012, 2014, and 2016, before placing him on probation in June 2016.  *See id.* ¶¶ 25–26, 34–35, 38, 73, 90, 99.  During his probation, Harrell failed to make his required check-in calls and "did not achieve his Unit or Revenue goals for June 2016."  *Id.* ¶¶ 105–06.  Finally, in July 2016, Moss consulted with Gross and Employee Relations Specialist Jackson, and they concluded that Harrell's termination was warranted for his "documented failure to deliver on the expectations outlined in the probation document and to consistently meet his monthly goals and quotas, and the constant complaints regarding his performance.  *Id.* ¶ 110.  Poor performance is a legitimate reason to terminate an employee.  *See, e.g.*, *Johnson v. District of Columbia*, 99 F.

Supp. 3d 100, 102 (D.D.C. 2015).  And there is undisputed evidence in the record that PNC believed Harrell performed poorly.

Harrell, for his part, contends that there is a factual dispute about the quality of his performance.  *See* Pl.'s Opp'n at 23–31.  But as this Circuit has explained, "the key question in this context 'is not the correctness or desirability of the reasons offered but whether the employer honestly believes in the reasons it offers.'"  *Hairston v. Vance-Cooks*, 773 F.3d 266, 273 (D.C. Cir. 2014) (quoting *Fischbach*, 86 F.3d at 1183 (internal quotation marks and alterations omitted)).  Much of Harrell's opposition misguidedly focuses on whether the reasons PNC gave for terminating Harrell's employment were correct.  *See* Pl.'s Opp'n at 23–27.  And where the opposition does seem to turn to the honesty of PNC's beliefs about his performance, *see id.* at 27–31, he is incorrect about the record.  For example, Harrell points to an email from Moses that said "HR is definitely going to push back to moving [Harrell] to probation because [he] has not been given a fair chance to perform," Pl.'s Opp'n Ex. 8 (Gross Dep.), at 72:8–10, to suggest that his probation "was not legitimate," Pl.'s Opp'n at 29.  Whether Harrell had sufficient opportunity to perform does not raise a dispute as the quality of his performance or PNC's belief that Harrell performed poorly.  Moreover, the excerpt of the email Harrell quotes ignores the next sentence: "I am making sure he hits his SODs."  Gross Dep. at 72:10–11.  This shows that Moses had a genuine belief in the poor quality of Harrell's performance and made a sincere attempt to improve it.

Harrell also argues that PNC officials' concern over inaccuracies in his probation document suggest that PNC's justification was not legitimate.  *See* Pl.'s Opp'n at 29.  Although the cited portion of Gross's deposition does show a conversation over potential inadequacies in the document, *see* Def.'s Reply Ex. 5 (Gross Dep. Suppl.), at 97:1–98:22, Harrell misrepresents

20

what those inadequacies were and what they mean.  Gross explained that his concerns were that

the document did "not include performance expectations and monitoring."  Gross Dep. Suppl. at

97:4–5.  He also gave his impression of his email: "it looks like what I want to do is expand, so

we can help [Harrell] in this situation."  *Id.* at 98:3–4.  In the light most favorable to Harrell, this

exchange suggests that PNC could have given a more fulsome explanation of Harrell's

probation.  But nothing in the exchange calls into question either the genuineness of the

company's belief about Harrell's performance or the actual quality of that performance.  Nor

does the fact that Harrell was terminated before the maximum length of his probation plausibly

undermine the legitimacy of PNC's explanation, *see* Pl.'s Opp'n at 28, especially considering

that PNC gave Harrell multiple opportunities over a number of years to improve his performance

before placing him on probation.

Accordingly, the defendant has proffered a legitimate explanation for Harrell's

termination.

## B.   Evidence of Pretext

At this point, the "plaintiff bears the burden of showing either that 'the employer's reason

is pretextual or . . . that it was more likely than not that the employer was motivated by

discrimination.'"  *Gold v. Gensler*, 840 F. Supp. 58, 65 (D.D.C. 2012) (quoting *Ford v.*

*Mabus*, 629 F.3d 198, 201 (D.C. Cir. 2010)) (omission in original).  The Court thus considers

"all relevant evidence" presented by both parties that would support the plaintiff's prima facie

case and suggest "the employer's proffered reasons to be false."  *Faison v. District of Columbia*,

664 F. Supp. 2d 59, 67 (D.D.C. 2009) (first quoting *Brady v. Off. of Sergeant at Arms*, 520 F.3d

490, 495 (D.C. Cir. 2008); then citing *Aka v. Wash. Hosp. Ctr.*, 156 F.3d 1284, 1289 (D.C. Cir.

1998); *Adeyemi v. District of Columbia*, 525 F.3d 1222, 1227 (D.C. Cir. 2008)).  "It is not

sufficient to 'show that a reason given for a job action [was] not just, or fair, or sensible;' nor is it sufficient to challenge 'the "correctness or desirability" of [the] reasons offered.'" *Moeller v. LaFleur*, 246 F. Supp. 3d 130, 140 (D.D.C. 2017) (quoting *Fischbach*, 86 F.3d at 1183).  Rather, the plaintiff must provide evidence suggesting "that the employer's stated reasons were 'phony.'"  *Id.* (quoting *Fischbach*, 86 F.3d at 1183).  "[A]n employer's action may be justified by a reasonable belief in the validity of the reason given even though that reason may turn out to be false."  *George v. Leavitt*, 407 F.3d 405, 415 (D.C. Cir. 2005).

Harrell has proffered two arguments for pretext.  First, he asserts that comments made by O'Kelly exhibit discriminatory animus that raise a triable issue of fact as to whether the PNC's explanation for his termination was pretextual.  *See* Pl.'s Opp'n at 18–20.  Second, Harrell contends that PNC has treated him and other older employees worse than similarly situated younger employees.  *See id.* at 20–23.  The Court will address each in turn.

### 1. Supervisor comments

Harrell points to statements by supervisor O'Kelly as evidence of discriminatory animus. *See* Pl.'s Opp'n at 20–21.  Harrell said that O'Kelly told him during a corrective action, "You know, I'm getting to know you.  I think you are a very nice person, but I'm telling you, they want fresh new blood here, so we got to kick it into gear."  Pl.'s Opp'n Ex. 1 (Harrell Dep.), at 149:8–11; *see id.* at 149:16–19.  Later, Harrell testified that that O'Kelly "talk[ed] about youthful people being brought in."  *Id.* at 219:18–19.  He also said that O'Kelly "made fun of [his] flip phone."  *Id.* at 222:7.  He claims O'Kelly said, "[Y]our flip phone kind of gives away your age, instead of a smart phone."  *Id.* at 222:9–10.

"[S]tray remarks of nondecisionmakers are not sufficient, standing alone, to raise an inference of discrimination."  *Beshir v. Jewell*, 961 F. Supp. 2d 114, 126 (D.D.C. 2013) (quoting

*Aliotta v. Bair*, 614 F.3d 556, 570 n.6 (D.C. Cir. 2010)); *see also Sagar v. Mnuchin*, 305 F. Supp. 3d 99, 110 (D.D.C. 2018), *aff'd*, No. 18-5183, 2019 WL 667201 (D.C. Cir. Jan. 29, 2019) (noting that "innocuous remarks 'unrelated to the relevant employment decision [do] not, without more, permit a [reasonable] jury to infer discrimination'" (quoting *Morris v. McCarthy*, 825 F.3d 658, 669 (D.C. Cir. 2016)) (alteration in original)).  "[T]here must be a nexus between the remark and the adverse employment decision." *Beeck v. Fed. Exp. Corp.*, 81 F. Supp. 2d 48, 54 (D.D.C. 2000) (citing *Kalekiristos v. CTF Hotel Mgmt. Corp.*, 958 F. Supp. 641, 665 (D.D.C. 1997)).  *Cf. Oviedo*, 948 F.3d at 394–95 (explaining, in Title VII context, that statement by non-decisionmaker was neither direct nor indirect evidence of discrimination).  It is undisputed that O'Kelly played no role in the decision to terminate Harrell.  *See* Def.'s Statement of Undisputed Facts ¶ 110.  And there is nothing in the record to show any other kind of nexus between O'Kelly's remarks and the decision to terminate.  Accordingly, these comments do not support Harrell's claim that poor performance was a merely pretextual reason for his termination.[11]

### 2.   *Disparate treatment*

As further evidence of pretext, Harrell asserts that the given reason for his termination was pretextual is that he and other older employees were treated worse than younger employees. *See* Pl.'s Opp'n at 19–23.  He says that Moses moved him to DC West, where he did not want to work, to accommodate younger employee Jessica Jay Burgess.  *See* Harrell Dep. at 140:6–141:20, 205:1–206:19, 208:4–212:8.  Harrell also contends that other employees were terminated

---

[11] Furthermore, it is undisputed that O'Kelly recruited Harrell after his termination to do similar work at O'Kelly's new employer, and Harrell accepted the position.  Def.'s Statement of Undisputed Facts ¶ 120.  Many courts have recognized that there is a "presumption or inference of non-discrimination" when the same individual who fired the plaintiff had also previously hired him.  *See Waterhouse v. District of Columbia*, 124 F. Supp. 2d 1, 12 (D.D.C. 2000) (collecting cases).  A similar presumption applies here.

because of age discrimination.  *See* Pl.'s Opp'n at 21.  During his deposition, Harrell pointed to

Harold Hambel, Stewart McConnell, Bernard Robinson, Ulric Donawa, Glenn Kinnard, and

Jennifer Faduhl as examples.  *See* Harrell Dep. at 118:7–124:18, 130:13–139:21, 146:2–4.  He

also pointed to corrective action against Pat Fiorina, who he believed to be targeted because of

her age.  *See* Harrell Dep. at 165:13–181–22.  Harrell contrasts these older employees with

younger employees Brandon Ewell, Jessica Jay Burgess, and Elsa Gossa, whom he believes were

not subject to the same treatment and were given easier assignments.  *See* Harrell Dep. at 203:3–

206:19.

       There are both legal and factual problems with Harrell's theory.  First, his theory is

grounded in speculation as to what happened at PNC.  But, "[t]o defeat a motion for summary

judgment, a plaintiff cannot create a factual issue of pretext with mere allegations or personal

speculation, but rather must point to genuine issues of material fact in the record."  *Nguyen v.*

*Mabus*, 895 F. Supp. 2d 158, 177 (D.D.C. 2012) (internal quotation marks omitted) (quoting

*Hastie v. Henderson*, 121 F. Supp. 2d 72, 77 (D.D.C. 2000), *aff'd*, No. 00-5423, 2001 WL

793715 (D.C. Cir. 2001) (citation omitted)); *see also McGill v. Munoz*, 203 F.3d 843, 846 (D.C.

Cir. 2000) (explaining that speculation is not evidence and not sufficient to avoid summary

judgment).  Harrell admitted in his deposition that his theories about other employee's departures

or corrective actions was not based on any factual knowledge.  *See, e.g.*, Harrell Dep. at 120:10–

123:9 (admitting that no one told him why Stewart McConnell departed, but that "people always

were speaking around the company" and agreeing that "team members were all talking about

what happened" to him); *id.* at 123:10–124:4 (same for Bernard Robinson); *id.* at 130:13–134:22

(admitting that Hambel did not tell Harrell the specifics of his written warning and that Harrell

did not see any details of Hambel's disciplinary actions); *id.* at 147:15–22 (admitting that he

believed departures were "age related simply based on the appearance of [the] individuals"); *id.* at 148:2–13) (admitting that he did not know anything about the performance or disciplinary history of the departed employees, nor did he know whether they left voluntarily or were terminated (except for Hambel)).  This kind of speculation does not create a genuine dispute of material fact that can defeat summary judgment.

Second, as PNC points out, *see* Def.'s Reply at 17, Harrell does not dispute that there were both older and younger employees who were subject to performance corrective actions and several older employees who remained employed in spite of such actions.  *See* Def.'s Statement of Undisputed Facts. ¶ 127 (listing five employees who received corrective action in 2015 or 2016, three of whom were over forty and two of whom were under forty).  He does not dispute that fifty-two-year-old Castaneda was placed on probation, improved his performance, and eventually became a top three performer on Moses' team.  *See id.* ¶¶ 128–29.  Harrell also does not dispute that nine of the twelve account executives assigned to O'Kelly and then Moses were over the age of forty (and five were older than Harrell), and they all continued to be employed by PNC after Harrell's departure.  *See id.* ¶ 124.  Furthermore, Harrell's comments about Fiorina are not supported by record evidence.  In fact, he does not dispute that Fiorina was and remained in the greater Washington area market for the entirety of his tenure and that she was a top performer.  *See id.* ¶¶ 124–25.  Accordingly, there is not sufficient record evidence in dispute to support Harrell's disparate treatment theory of pretext.

Because PNC "has proffered a legitimate, nondiscriminatory reason for" Harrell's termination, *Grosdidier v. Broadcasting Bd. of Governors*, 709 F.3d 19, 25 (D.C. Cir. 2013), the burden is on Harrell to "produce[] sufficient evidence for a reasonable factfinder to conclude that the defendant's asserted justification was not the actual reason for his [decision] and that the

defendant discriminated against the plaintiff." *Glenn*, 643 F. Supp. 2d at 31 (citing *Brady*, 520

F.3d at 494).  Harrell has failed to do so, and thus summary judgment in favor of PNC is

appropriate.

**CONCLUSION**

For the foregoing reasons, the Court will grant the defendant's motion for summary

judgment.  A separate order consistent with this decision accompanies this memorandum

opinion.

DABNEY L. FRIEDRICH
United States District Judge

February 22, 2022